UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

KENNETH CLACK,                          )
                                        )
                  Plaintiff,            )
v.                                      )          No. 1:06-cv-119
                                        )          *Lee*
ROCK-TENN COMPANY and                   )
ROCK-TENN COMPANY, MILL                 )
DIVISION, INC.,                         )
                                        )
                  Defendants.           )


## MEMORANDUM AND ORDER

### I.      Introduction

Before the Court are: (1) the motion of Defendants Rock-Tenn Company and Rock-Tenn

Company Mill Division, Inc. (collectively "Rock-Tenn") for summary judgment pursuant to Fed. R.

Civ. P. 56 on the claims of Plaintiff Kenneth Clack of racial discrimination and retaliation under Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* [Doc. No. 17] and (2) the

motion of Plaintiff to strike exhibits E, F, H and I to Rock-Tenn's motion for summary judgment [Doc.

No. 29].  Plaintiff has filed a response [Doc. No. 23] and a supplemental response in opposition to

Rock-Tenn's motion for a summary judgment [Doc. No. 28].  Rock-Tenn has filed a reply to Plaintiff's

response [Doc. No. 30].  Rock-Tenn has also filed a response to Plaintiff's motion to strike [Doc. No.

33].

Also before the Court is the motion of Plaintiff to consider the affidavit of Emmanuel

Calloway ("Calloway") in opposition to Rock-Tenn's motion for summary judgment [Doc. No. 39].

Rock-Tenn filed their motion for summary judgment on May 3, 2007 [Doc. No. 17].  On May 23, 2007,

Plaintiff moved for an extension of time to respond to Rock-Tenn's motion [Doc. No. 20] and on June

4, 2006, the Court entered an Order extending the time to respond to Rock-Tenn's motion for summary judgment until June 6, 2007 [Doc. No. 24]. On June 1, 2007, Plaintiff filed his response to Rock-Tenn's motion for summary judgment [Doc. No. 23] and, because Plaintiff's response was not complete, Plaintiff filed a supplemental, *i.e.,* complete, response to Rock-Tenn's motion for a summary judgment on June 6, 2007, [Doc. No. 28].

Defendant states that since June 6, 2007, he has secured Calloway's affidavit and seeks to have it considered in ruling on Rock-Tenn's motion for summary judgment [Doc. No. 39 at 1]. Attached to Plaintiff's motion is the affidavit of Calloway, which is dated June 29, 2007 [Doc. No. 39-2]. Plaintiff has chosen to file the affidavit of Calloway some 37 days after his response to Rock-Tenn's motion for a summary judgment was originally due on May 23, 2007, and 23 days after Plaintiff was given an extension of time, from May 23, 2007 to June 6, 2007, in which to respond to Rock-Tenn's motion for a summary judgment. Plaintiff has offered no explanation for the delay in obtaining the affidavit of Calloway other than he did not obtain the affidavit until after he filed his supplemental memorandum. The Court notes, however, Calloway was listed as a witness by Plaintiff as early as June 4, 2007 [Doc. No. 26].

A district court has the discretion to refuse the filing of untimely affidavits filed in support of a motion for a summary judgment. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1446 (6th Cir. 1993). Plaintiff has not shown good cause for his delay in filing Calloway's affidavit in support of his motion for a summary judgment. Further, trial of this matter is scheduled for July 17, 2007, and there is no indication Rock-Tenn has had an opportunity to respond to Calloway's affidavit. Consequently, the Court will not consider Calloway's untimely affidavit. Accordingly, Plaintiff's motion to consider the affidavit of Calloway in opposition to Rock-Tenn's motion for summary judgment [Doc. No. 39] is **DENIED**.

Rock-Tenn's motion for a summary judgment and Plaintiff's motion to strike are now ripe for review. In summary, Plaintiff is unable to meet his burden of demonstrating Rock-Tenn's articulated reason for his termination was a pretext designed to mask discrimination and/or retaliation. For the reasons set forth herein: (1) Rock-Tenn's motion for summary judgment [Doc. No. 17] will be **GRANTED** and (2) Plaintiff's motion to strike [Doc. No. 29] will be **DENIED**.

## II.    Background

### A.    Procedural History

An arbitrator found Plaintiff had not been discharged for "good cause" under a collective bargaining agreement ("CBA")[1] and ordered that Plaintiff be reinstated and made whole. Plaintiff then filed the instant action in the Chancery Court of Hamilton County, Tennessee seeking attorneys' fees and costs, compensatory damages for lost wages, mental pain, suffering, embarrassment, and humiliation, and punitive damages [Doc. No. 1]. His complaint sets forth claims of racial discrimination and retaliation in violation of Title VII [Doc. No. 1-2 at 3].

Plaintiff alleges that on or about February 2, 2005, after complaining to Rock-Tenn's management about harassment in early 2005, he was sent home from work based upon an alleged incident of insubordination [*id.* at 4]. Plaintiff alleges he had not been insubordinate, but was attempting to secure his rights under the CBA between Rock-Tenn and the United Steel, Paper and Forest, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, Local No. 362 (the "Union") [*id.*]. Plaintiff alleges he was terminated based on his race and prior protected behavior [*id.*]. Because this Court has federal question subject matter jurisdiction over

---

[1]  A copy of the CBA is attached to Rock-Tenn's memorandum in support of its motion for summary judgment [Doc. No. 19-4].

Plaintiff's Title VII claims under 28 U.S.C. § 1331, Rock-Tenn removed this case from state court to this Court on May 19, 2006, pursuant to 28 U.S.C. § 1441.

**B.    Facts**

Plaintiff is an African-American male and is an employee of Rock-Tenn at its Hamilton, County, Tennessee facility, where all of the acts that form the basis of this action are alleged to have occurred [Doc. No. 1-2 at ¶¶ 5, 7 and 8]. Rock-Tenn's Chattanooga facility is a recycled paperboard mill which purchases and recycles collected waste paper [Doc. No. 28 -2 at 2]. Rock-Tenn's Chattanooga facility, which has between 130 and 135 employees, produces recycled paperboard/cardboard on two paper machines in either a roll or sheet format [*id.*].

**1.    Plaintiff's Affidavit**

Plaintiff filed his affidavit, dated May 23, 2007, in support of his response to Rock-Tenn's motion for summary judgment [Doc. No. 23-2]. Plaintiff stated he was employed by Rock-Tenn beginning in November 1986 [*id.* at 1 ¶ 2]. He states that during the period from 1996 through 1998, he was subject to racial harassment at the Rock-Tenn workplace, including "being threatened with a hanging noose and being threatened with having a cross burned in his yard" [*id.* at ¶ 3]. Plaintiff asserts that after Rock-Tenn learned of this harassment but refused to take any action to protect him, he filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in 1998 and, then filed a lawsuit later that year [*id.* at ¶ 5]. Plaintiff states the forgoing issues "were ultimately settled during litigation in 2000." [*Id.*].

Plaintiff states Walter Lancaster ("Lancaster"), the current General Manager at Rock-Tenn's Chattanooga facility, was employed at the facility when Plaintiff filed his lawsuit in 1998 and, following the lawsuit, Lancaster "was rude to me and short with me and treated me differently than workers who had not sued the company" [*id.* at 1-2, ¶¶ 7, 8]. Plaintiff asserts that on August 28, 2003,

he filed a grievance alleging harassment and retaliation against Lancaster [*id.* at 2, ¶ 8]. On September 12, 2003, Plaintiff filed an EEOC complaint based upon Lancaster's alleged discrimination and retaliation [*id.* at ¶ 10].

Plaintiff further asserts that on November 1, 2004, he filed a grievance against Bill Murphy ("Murphy") alleging Murphy "had told lies against me and had made threatening statements to me" [*id.* at ¶ 11]. Plaintiff states that a meeting concerning his grievance against Murphy was held on December 3, 2004 at which he complained that Murphy used racial considerations in his work decisions and treatment concerning Plaintiff [*id.* at 12]. Plaintiff asserts that as a result of the aforementioned grievance, he was told by Lancaster, "that if I felt I was subject to harassment by Murphy, I should contact Mike McDougal ("McDougal") immediately. I was not instructed to wait until a break" [*id.* at ¶ 13]. Plaintiff states that after the filing of the aforementioned grievance:

> Murphy began to treat me more hostile than even before. When he would speak to me, he would use much harsher tone of voice than with other employees. In addition, I would often see him glaring at me across the workroom floor. This made me very uncomfortable because of his previous threats against me."

[*id.* at 3, ¶ 15].

Plaintiff stated that in February 2005, he was working as the number two filler man [*id.* at ¶ 16]. According to Plaintiff, as the number two filler man, his job was primarily to load raw materials into the large pulper [*id.*]. Plaintiff states that on his shift the utility man "was primarily responsible for cleaning up refuse from the process or debris that spilled over . . . onto the floor. The utility man almost exclusively performed this task" [*id.* at ¶ 17].

According to Plaintiff while he was at work on the morning of February 1, 2005:

> Murphy intentionally walked very close to me and bumped into me.
> This caused me concern because of Murphy's prior threats against

me. I intended to report this to Mike McDougal, but did not see him prior to being sent home.

[*id.* at ¶ 18]. Plaintiff states that later during that same day, February 1, 2005, as he was performing his normal duties, "Murphy instructed me to stop my normal job and clean up some debris which had fallen out of the beater. The debris was not in my way and was not interfering with my job responsibilities" [*id.* at ¶ 19]. Plaintiff's affidavit continues:

> **23.** When I was instructed that it was my job if Murphy said that it was, I perceived this as continued harassment by Murphy of the same nature I had already experienced and in retaliation for my Union grievance that I had filed in November. I therefore told Murphy that I wanted to speak to Mike McDougal. This was in conformance with Mr. McDougal's explicit instructions as a resolution of my November 1, 2004, grievance.

> **24.** When I was instructed to clean the area, I did not refuse to do so. I simply informed Murphy that it was not my job function to perform the task and that I was calling Mr. McDougal.

> **25.** When I informed Murphy that I was going to contact McDougal, Murphy responded that if I did so, he would hold me insubordinate and send me home. When I again said that I was going to call McDougal as per my instructions, Murphy instructed me to contact my Union representative and meet him in the office.

[*id.* at 4]. Plaintiff further stated that by the time his Union representatives reached the area of the incident "Murphy had returned to the area and appeared to be very angry at me." [*Id.* at ¶ 26].

Plaintiff states on February 2, 2005, a meeting was held by McDougal concerning the February 1, 2005 events between Plaintiff and Murphy [*id.* at ¶ 31]. Plaintiff was terminated by Rock-Tenn on February 7, 2005 [*id.* at ¶ 35]. Plaintiff states, "following my termination, I was replaced by Jeff Stoker, who is white" [*id.* at ¶ 36]. Plaintiff states pursuant to the CBA, he "grieved my termination of February 7, 2005, and the issue was sent to arbitration. The arbitrator found that there was no just cause for my termination and ordered me reinstated to my work position." [*Id.* at ¶ 37].

## 2.     Plaintiff's Deposition Testimony

Plaintiff's deposition, taken on March 27, 2007, also appears in the record [Doc. Nos. 19-13 & 19-14]. Plaintiff testified he began working at Rock-Tenn on November 21, 1986 [Doc. No. 19-13 at 5]. Plaintiff testified that at some point during his employment he began working as the number one filler man [*id.* at 19]. Plaintiff claimed he experienced discrimination, harassment or retaliation while working in that position [*id.*]. Plaintiff stated on one occasion, both he and his supervisor were not wearing their safety glasses and he was disciplined for not wearing his safety glasses but his supervisor was not [*id.* at 20]. Plaintiff claims this was discrimination because he was treated differently than his supervisor, who was white [*id.*]. Plaintiff admitted, however, that he and his supervisor were not similarly situated because his supervisor was in a position of authority above him [*id.* at 20-21].

Plaintiff also testified about the grievance he filed concerning Lancaster [*id.* at 37]. Plaintiff testified he was using his fork lift to hold a piece of metal in a position so it could be welded [*id.*]. Plaintiff stated he was moving his fork lift so the metal could be welded [*id.*]. Plaintiff stated Lancaster walked in front of his fork lift and told him "to watch where the h*** I'm going" [*id.*]. Plaintiff stated Lancaster was walking in front of his forklift and got "mad" as the fork lift moved forward while he was in front of it [*id.* at 40]. Plaintiff stated Lancaster became angry and he thought Lancaster wanted to fight with him [*id.*]. Plaintiff stated he did not believe the situation was discrimination or harassment, but he filed a grievance because he thought it unreasonable that Lancaster became angry [*id.*]. Plaintiff admitted, however, that he and Lancaster were both arguing and that he was "yelling back" at Lancaster [Doc. No. 19-14 at 20]. Plaintiff stated Lancaster stated they both needed to calm down and he stated Lancaster did not have "fists or anything" [*id.* at 21].

Plaintiff stated on another occasion he was putting rolls on the number two filler which were too big [Doc. No. 19-13 at 43]. Plaintiff stated Lancaster and John Stagmaier looked at the conveyor

on which he was trying to put the rolls, and he was given a "step" in the disciplinary process [*id.*].

Plaintiff admitted, however, it was part of his job duties at that time to ensure he was putting the rolls

of the correct type and size on his machine [*id.* at 44]. Plaintiff said after he was given the "step"

another white employee, Stoker, admitted he was at fault and the "step" was removed from Plaintiff's

file [*id.*]. Plaintiff claims, however, Stoker did not receive a "step" [*id.*].[2]

Plaintiff also testified about the grievance reports he filed in November 2004. He stated

superintendent Harvey Martin ("Martin") told him to feed the beater a certain way, but foremen

Murphy and Fred Akins ("Akins"),[3] who is African-American, told him to feed it another way [*id.* at

60]. Plaintiff stated he told Murphy and Akins that Martin had told him to feed the beater a different

way and Akins told him to feed it the way Akins had directed him to perform the job "or I can hit the

clock." [Doc. No. 19-14 at 1]. Plaintiff said as a result, he filed grievance reports claiming harassment

against Murphy and Akins [*id.*]. Plaintiff stated the harassment was that the superintendent wanted the

beater loaded one way and the foremen told him to load it another way [*id.* at 3]. When asked how this

dispute was related to either his race or color, Plaintiff stated, "[b]ecause that's the way they do. That's

Rock-Tenn." [*Id.* at 3]. Plaintiff admitted he had no evidence the dispute between the foremen and the

superintendent as to how to load the beater had anything to do with him, let alone his race and color

[*id.* at 4].

Plaintiff was specifically asked about what Lancaster told him concerning his grievance/the

dispute between the superintendent and the foremen concerning the loading of the beater [*id.* at 9].

_____

[2] Plaintiff also testified about an event that occurred over the Thanksgiving holiday in 2006, after he was reinstated to his position at Rock-Tenn following the grievance arbitration of the February 1, 2005 incident [*id.* at 46-47].

[3] The surname is spelled both Akin, Aiken, and Akins in the documents which appear in the record. Solely for the sake of consistency, the Court will use Akins throughout this document.

Plaintiff stated Lancaster "told me whatever foreman is on that shift, to do what they say." [*Id.*]. Plaintiff stated as the general manger, Lancaster was above the superintendent [*id.*].

Plaintiff claimed he was also harassed by Rock-Tenn in "a couple" of incidents where he was told paper had been "shipped out wet." [*id.* at 16]. Plaintiff stated he did not know whether paper had been shipped out wet [*id.*]. Plaintiff stated another time he was told paper had been cut too short [*id.*]. Plaintiff admitted that if the paper were in fact shipped out wet he would have been at fault and should have been "written up for that" [*id.* at 17]. He also agreed that if the paper had been sent out too short he also should have been written up for that [*id.*].

Plaintiff testified about the events of February 1, 2005 [*id.* at 23]. He testified he was terminated as the result of events occurring that day [*id.*]. Plaintiff stated on February 1, 2005, Murphy was present when he was dumping a bucket with a forklift [*id.*]. Plaintiff stated that when he came back with the bucket, Murphy told him to get a tire and clean up some debris [*id.*]. Plaintiff stated he told Murphy it "wasn't my job, that was Denny Wooten's job. I said, even if I wanted to do it, I don't have the forklift to clamp the tire to clean it." [*Id.* at 23]. Plaintiff stated Murphy told him, "[i]f I tell you it's your job, then it's your job." [*Id.*]. Plaintiff stated he then told Murphy, "Well, I'm going to call Mike McDougal." [*Id.*]. Plaintiff stated Murphy responded, "If you call Mike McDougal, I'm going to hold you for insubordination. Which I didn't think he could do. I went and called Mike McDougal." [*Id.* at 23-24].

When asked why he was going to telephone McDougal, Plaintiff stated "[b]ecause Mike McDougal and Walt Lancaster told me if I have any problem out of Fred Akins and Bill Murphy, to come to them." [*Id.* at 24]. Plaintiff admitted Lancaster and McDougal had not told him to ignore what the foreman had to say; instead, they wanted him to let them know about problems with the foreman

[*id.*].  Plaintiff further admitted that even though he did not have the proper fork lift for cleaning up the debris from the area, he could have cleaned up the area with other equipment [*id.*].

When Plaintiff was asked why he needed Union representatives after Murphy told him to clean up the debris, Plaintiff testified: "Well, basically, because we was arguing, and he had told me he was going to hold me for insubordination for calling Mike McDougal." [*Id.* at 26].  When asked what the Union was going to do about his argument with Murphy, Plaintiff stated: "Well, we have a union there. They can see what's going on, if it's justified or not." [*Id.*].

Plaintiff stated after he walked into the break room to call McDougal, he did not see Murphy for a couple of minutes [*id.* at 26].  Plaintiff stated Murphy came into the break room and stated he wanted Plaintiff off the premises [*id.* at 27].  Plaintiff stated the Union representatives asked Murphy if Plaintiff had refused to perform the job and Murphy again stated he wanted Plaintiff off the premises [*id.*].  At this point in the deposition, Plaintiff was asked, "But you didn't do the job when you were asked, did you?" [*id.* at 28].  Plaintiff's response was "No, sir." [*Id.*].

Plaintiff stated after he left the premises on February 1, 2005, he was called by McDougal, who told him there was going to be meeting he should attend [*id.* at 34].  Plaintiff was asked at what point he decided to file an EEOC charge or lawsuit and he stated:

> I guess when they actually said I was fired. I didn't feel like they had reason to fire me.  I did what they told me to do, to call them if I had a problem.  When it came down to it, they didn't hold up to their word.  I called, and they didn't hold up to what they told me to do.

[*Id.*].

When asked what about Murphy's order to clean up the debris constituted discrimination or harassment, Plaintiff stated:

> I was told to clean that area when it was Denny Wooten's job to clean it, which is a white employee's job, I was doing my job, He was

going to pull me from my job to do a white individual's job. It was
his job to do.

[*Id.* at 44]. Plaintiff admitted, however, he had no idea why Denny Wooten ("Wooten") did not

perform the job of cleaning up the debris [*id.*].

### 3.    Ted Bonine's Affidavit

Plaintiff has also submitted the affidavit of Ted Bonine ("Bonine"), dated May 24, 2007 [Doc.

No. 23-3]. Bonine, who is white, was employed at Rock-Tenn from approximately 1999 through either

2001 or 2002; and, during his last year of employment, he was a foreman and worked with Murphy [*id.*

at ¶¶ 1, 2, 5]. Bonine stated that he found Murphy to be "extremely racially offensive" and that during

the course of his employment at Rock-Tenn, he heard Murphy use "offensive slurs toward black

employees, calling them 'n*****s' and 'Black mother f***ers.'." [*Id.* at ¶ 6]. Bonine states that

Murphy also repeatedly opined that black employees "were generally lazy and 'Good for nothing.'"

[*id.* at ¶ 7].

Bonine further stated that Murphy always treated the black employees more harshly than white

employees; and, that Murphy seemed to single out Plaintiff for his racially based rage [*id.* at ¶ 10].

Bonine stated that Murphy was aware of Plaintiff's prior lawsuit against Rock-Tenn, repeatedly spoke

about it, and was angry about Plaintiff's prior lawsuit [*id.* at ¶ 11]. Bonine states on one occasion he

traveled with Murphy and during the trip, Murphy repeatedly spoke about Plaintiff in a racially

offensive manner [*id.* at ¶ 12]. Bonine quoted Murphy as stating "[Plaintiff] is nothing but a f***ing

n****r" and "I am going to get rid of him." [*Id.* at ¶ 13]. Bonine stated Murphy said he wanted to throw

Plaintiff in the pulper and "string him up" [*id.* at ¶¶ 14, 15]. Finally, Bonine stated in his affidavit:

As a foreman, I believe that I respected all of the employees and felt
that I had a good relationship with the black employees. This made
Mr. Murphy angry and he commented that I was too friendly with the

black employees.  He would also become angry when I would defend
a black employee or ask him to stop his offensive language.

[*id.* at ¶ 17].

### 4.    Danelle Rogers' Affidavit

In addition, Plaintiff has submitted the affidavit of Danelle Rogers ("Rogers"), an African-American employee of Rock-Tenn during February 2005 [Doc. No. 23-4 at ¶¶ 1, 2].  Rogers was the Union representative who was called to the scene following the dispute between Plaintiff and Murphy on February 1, 2005 [*id.* at ¶ 3].  Rogers states both Plaintiff and Murphy were present when he arrived at the scene [*id.* at ¶ 4].  Rogers also states Plaintiff was asked if he had refused to perform any task and Plaintiff responded he had not refused [*id.*].  Rogers further states Murphy was asked why he was sending Plaintiff home and Murphy refused to answer [*id.* at ¶ 5].

Rogers states that when he arrived on the scene, another foreman, Akins had to get between Plaintiff and Murphy in order to prevent a physical altercation [*id.* at 2, ¶ 7].  Rogers was also present at the February 2, 2005 meeting concerning the events between Plaintiff and Murphy on February 1, 2005 [*id.* at ¶ 10].

In addition, Rogers' affidavit states that after Plaintiff's termination:

> Murphy acted proud of what he had accomplished.  He seemed very
> happy that Mr. Clack had been terminated.  His reaction was not
> consistent to a regular termination.

[*id.* at ¶ 13].  Rogers also states in his affidavit that after Plaintiff was terminated, Murphy "made the statement that he had 'finally got rid of [Plaintiff]'" [*Id.* at ¶ 14].

### 5.    Tommy Earvin's Affidavit

Plaintiff has also submitted the affidavit of Tommy Earvin ("Earvin") in support of his response to Rock-Tenn's motion [Doc. No. 23-5].  Earvin, an African-American male, has been

employed at Rock-Tenn for many years and was employed there in February 2005 when Plaintiff was terminated [*id.* at ¶¶ 1, 2]. Earvin stated he has "seen management treat [Plaintiff] different than other employees who were not known to complain." [*Id.* at ¶ 3]. He gave two examples of such "different" treatment [*id.* at ¶¶ 4, 5]. However, neither involved a claim of insubordination and Earvin failed to state when the incidents occurred [*id.*].

Earvin stated he observed the incident leading to Plaintiff's termination and observed Murphy "seemed agitated and more aggressive than called for by the situation" [*id.* at ¶ 6]. Earvin also stated that after Plaintiff was terminated "Murphy acted proud . . . He seemed very happy that [Plaintiff] had been terminated. His reaction was not consistent to a regular termination." [*Id.* at ¶ 7]. Earvin stated that on several occasions after Plaintiff's termination, Murphy stated "I got the hammer [Plaintiff]" and "I got him." [*Id.* at 8].

### 6. Transcript of the February 2, 2005 Meeting

A transcript of the meeting which occurred on February 2, 2005, concerning the incident of February 1, 2005, has been submitted by Rock-Tenn in support of its motion for summary judgment. During the meeting, McDougal asked Plaintiff about the events of February 1, 2005 [Doc. No. 19-8 at 1]. Plaintiff responded that on the morning of February 1, 2005, he was walking through a door at the same time as Murphy and they got too close and Murphy brushed Plaintiff's shoulder [*id.*]. Plaintiff planned to report the bumping event [*id.*]. Later that day, Murphy ordered or directed Plaintiff to take the tire and clean up in front of the number two filler beater [*id.* at 4]. Plaintiff told McDougal he did not do the cleaning because he wanted to call McDougal [*id.* at 5]. Plaintiff claimed he did not tell Murphy it was not his job, he only told Murphy "it's number two job." [*Id.* at 5-6].

At the meeting, Plaintiff stated McDougal responded by stating: "I'm telling you that if a supervisor gives you a direct order, you do it. And it's his right to give direct orders on doing" jobs

[*id.*].  Plaintiff questioned whether a supervisor could order him to do a job that was not his job [*id.*].

McDougal responded: "Sure.  They are your jobs if it's a reasonable request to do a job.  I mean,

obviously we'll have something to talk about if it's an unsafe deal or something extraordinary" [*id.*].

Plaintiff and the Union representatives insisted Plaintiff did not refuse to do the job, he only

left to call McDougal [*id.* at 9, 12].  Plaintiff's Union representatives stated that Plaintiff was not

refusing to do the job he was ordered to do, he was just calling McDougal to get clarification of his job

description [*id.* at 19].  McDougal replied, "his job is to do what the supervisor tells him to do" [*id.* at

19].

### 7.     The Arbitration

Plaintiff first challenged his termination through the grievance and arbitration process set forth

in the CBA.  The arbitration of Plaintiff's grievance concerning his termination was held on July 27,

2005, and Plaintiff has submitted a copy of the transcript of the arbitration proceeding in support of his

response to Rock-Tenn's motion [Doc. No. 23-6].  The arbitration resulted in an award in favor of

Plaintiff.

At the arbitration proceeding, Plaintiff's counsel asserted Plaintiff's discharge violated the

"just cause" provision of the CBA [*id.*].  The just cause provision of the CBA states:

> It is mutually understood that the Company may employ persons of
> its own selection.  It has the right to lay off employees because of lack
> of work and to recall them; the right to transfer or promote
> employees, and to discharge or otherwise discipline any employee for
> just cause, subject to the other provisions of the Contract.  Both the
> Company and the Union agree that they will comply with the
> requirements of Title VII of the Civil Rights Act of 1964, as
> amended, in the administration of this agreement, neither the
> Company nor the Union shall discriminate against any employee
> because of that employee's race, color, sex, religion, national origin,
> age, or union membership, or . . . disability.

[Doc. No. 19-4 at 10].

-14-

Murphy testified during the arbitration proceeding that at the time of the incident on February 1, 2005, he observed Plaintiff emptying the scavenger bucket and noticed there was a pile of debris, both plastic and garbage under the bucket [Doc. No. 23-6 at 4]. Murphy stated he asked Plaintiff "before he put the bucket back [to] go get the tire, use a tire to clean the material out, get the tire, scrape it out and clean it out before he put the bucket back." [*Id.*]. Murphy stated Plaintiff told him it was not his job and left [*id.*]. Murphy stated Plaintiff never performed the job he was asked to do [*id.*]. Murphy told Plaintiff he would be discharged for insubordination for not doing the job as requested [*id.* at 5].

McDougal also testified at the arbitration proceeding [*id.* at 6]. McDougal stated he became involved in the situation at the follow-up meeting which occurred after the events of February 1, 2005 [*id.*]. McDougal stated he became involved due to a telephone conversation with Murphy about the events of February 1, 2005 [*id.*]. McDougal stated that at the follow-up meeting he came to the conclusion Plaintiff had refused to do the job [*id.*]. McDougal discussed the situation with Lancaster and recommended Plaintiff's termination [*id.*]. McDougal stated Lancaster approved Plaintiff's termination [*id.*].

Plaintiff also testified during the arbitration proceedings [*id.* at 8]. He testified he filed a grievance concerning Murphy and Akins in December 2004 [*id.*]. Plaintiff stated there was a meeting where the resolution of the aforesaid grievance was discussed and Lancaster told him that if he had a problem with a foreman, to call the superintendent, either McDougal or Martin [*id.* at 8-9]. Plaintiff admitted that although Lancaster told him to call the superintendent if he had a problem, Lancaster did not tell Plaintiff he did not have to follow the instructions of his supervisor until he was able to talk with someone else [*id.*].

With regard to the events of February 1, 2005, Plaintiff testified that at the time Murphy asked him to clean up the debris, he told Murphy: (1) it was Wooten's job and (2) he did not have the proper

forks on his fork lift to perform the job [*id.* at 8]. Plaintiff stated his fork lift was in the shop being fixed and he was using a substitute fork lift until his usual fork lift was fixed [*id.*]. Plaintiff stated Murphy's reaction was that it was Plaintiff's job to do if Murphy told him to do it [*id.*]. Plaintiff stated he was going to call McDougal and Murphy stated that if he went to call McDougal, Murphy was going to hold him for insubordination [*id.*].

Brendan Rogers ("Rogers"), a Union steward, also testified during the arbitration proceeding [*id.* at 9]. Rogers stated he was present at a meeting on December 3, 2004, concerning a grievance filed by the Plaintiff [*id.* at 10]. Rogers stated it was his understanding that at the meeting, Lancaster told Plaintiff if he felt he were being harassed or treated unfairly to call supervision, mainly McDougal [*id.*]. Rogers stated although Lancaster told Plaintiff to call supervision, he did not tell Plaintiff he did not have to follow the instructions of his supervisor [*id.*].

Larry Scott ("Scott"), the Vice-President of the Union, also testified at the arbitration proceeding [*id.* at 11]. Scott was present in the office shortly after the incident of February 1, 2005 [*id.*]. Scott stated Plaintiff denied refusing to do anything, but Murphy stated he was sending Plaintiff home [*id.* at 11-12]. Scott stated he was aware that persons in Plaintiff's position, filler man, did occasionally use the tire to clean up scrap [*id.* at 12]. Scott also stated that based upon his familiarity with "custom and practice in the shop," he was somewhat familiar with a rule that "if an employee is given an order that is not unsafe that he doesn't like, his proper reaction is to do the work and" file a grievance later [*id.*].

McDougal was recalled to testify at the arbitration hearing [*id.* at 15]. McDougal stated he had heard Plaintiff's testimony he could not do the work Murphy asked him to do because of his equipment [*id.*]. McDougal stated there were "a variety of ways" Plaintiff could have done the work Murphy asked him to do; namely "[t]here are three or four tow motors in the beater room with the same features.

There's always a broom, a shovel, even for some debris there's a water hose." [*Id.*]. McDougal stated

the work Murphy asked Plaintiff to do was done shortly after Plaintiff was sent home on February 1,

2005 [*id.*]. McDougal stated "the job was done by the next employee who stepped up to fill that very

same job" [*id.*].

Arbitrator Barry Baroni issued his arbitration award/decision on October 21, 2005 [Doc. No.

23-7]. In his decision, the arbitrator stated:

> There is some merit to McDougal's suggestion that [Plaintiff] could
> have performed the job, by other available means, and "grieved later."
> This arbitrator is of the opinion that probably that would have been
> the best path for [Plaintiff] to follow – "comply and grieve later!"
> But, such a solution does not take into consideration the "heated"
> environment that existed between [Plaintiff] and Murphy at the time
> of the incident. Murphy was obviously very upset with [Plaintiff] at
> the time . . . The normal procedure . . . was for [Plaintiff] to "get his
> steward" to help diffuse the dispute between his foreman and himself.
> But, all Murphy told them was that he was sending [Plaintiff] home
> and would settle the matter in the morning. . . The arbitrator finds
> mitigation in some of the Union's arguments, specifically, with regard
> to the history between [Plaintiff] and Murphy; Murphy's refusal to
> discuss the work assignment with either [Plaintiff] or his Union
> representatives; and, the suggestion that [Plaintiff's] attempt to find
> McDougal to resolve the work dispute could have been mistakenly
> interpreted as insubordination.

[*Id.* at 23-7 at 6, 7]. The arbitrator further stated:

> [Plaintiff's] non-compliance was circumstantial, in that he was trying
> to contact McDougal, it appears, to resolve the work assignment
> dispute between himself and Murphy. [Plaintiff's] actions, of course,
> delayed compliance with the work order but there was no real proof
> to suggest that his intent was to "refuse to perform" subject work, but
> only to delay compliance until the work dispute could be resolved by
> McDougal. And, it is the arbitrator's considered opinion that given
> the history of harassment charges existing between the two men,
> [Plaintiff] was justified in his attempt to contact McDougal about
> what he thought to be similar harassment by Murphy.

[*Id.* at 8-9]. The arbitrator ordered that Plaintiff be reinstated, the discharge be expunged from his personnel records, and Plaintiff be made whole for all lost back pay and benefits that may have accrued from the date of the termination [*id.* at 11].

### 8. Denny Wooten's Affidavit

In support of its motion, Rock-Tenn submitted the affidavit of Wooten, dated May 2, 2007 [Doc. No. 19-15]. Wooten's affidavit states he is an employee at Rock-Tenn's Chattanooga facility and on February 1, 2005, the trim system at the facility was malfunctioning [*id.* ¶¶ 2, 3]. Wooten states as the number one utility man it was his responsibility to maintain the trim system and he was upstairs in the filler-process room trying to get the trim system back on line when Plaintiff walked off the floor [*id.* at ¶¶ 4, 5]. Wooten stated that after he completed his duties in the filler process room, he assisted Jeff Stoker ("Stoker") in cleaning up the debris around the hopper [*id.* at ¶ 6]. Wooten states cleaning up the debris was accomplished "in about five minutes using a forklift, rubber tire and shovel" [*id.* at ¶ 7].

### 9. Jeff Stoker's Affidavit

Rock-Tenn has also submitted the affidavit of Stoker in support of its motion [Doc. No. 19-16]. Stoker's affidavit states on the afternoon of February 1, 2005, he assisted Wooten in cleaning up the debris that had accumulated on the floor surrounding the scavenger hopper [*id.* at ¶ 3]. Stoker's affidavit states he used an extra forklift and rubber tire to push the debris against the hopper and then he and Wooten used a shovel to put the debris back into the beater [*id.* at ¶ 4]. Stoker estimates the job of cleaning up the debris was accomplished in about five minutes [*id.* at ¶ 5].

### 10. Bill Murphy's Affidavit

Rock-Tenn has also submitted the affidavit of Murphy, dated May 3, 2007, in support of its motion [Doc. No. 19-18]. Murphy states he is a tour foreman and, on some shifts, he is the direct supervisor of the Plaintiff [*id.* at ¶ 3]. According to Murphy's affidavit, at approximately 12:15 p.m.

on February 1, 2005, he observed Plaintiff emptying the scavenger hopper and observed a great deal of debris under the bucket [*id.* at ¶ 4]. Murphy states he told Plaintiff to clean up the accumulated debris before putting the bucket back [*id.* at ¶ 4]. Murphy further states that Plaintiff insisted this was not his job, it was the number two utility man's job [*id.* at ¶¶ 5, 6]. According to Murphy, at the time he told Plaintiff to clean up the debris, Murphy was aware "that both utility men were busy with other jobs in the beater room." [*id.* at ¶ 6]. Murphy states Plaintiff did not do the job he asked him to do, but, instead, walked off the floor to page McDougal, who did not respond to the page because he was out at lunch [*id.* at ¶ 9]. Murphy states he "honestly believed" Plaintiff's actions constituted insubordination [*id.* at ¶ 10].

Murphy's affidavit further states the debris he asked Plaintiff to clean up was primarily paper and plastic from the pulper which could easily have been cleaned up using available brooms or shovels [*id.* at ¶ 8]. Murphy's affidavit states in addition to the forklift Plaintiff was using at the time, there were several other forklifts available to Plaintiff to comply with Murphy's order [*id.* at ¶ 7].

### 11.    Bill Murphy's Deposition Testimony

Murphy's deposition also appears in the record [Doc. No. 30-5]. Murphy testified he began working at Rock-Tenn on April 3, 2000, as a tour foreman [*id.* at 8]. Murphy stated he is a supervisor of the production line, both the beater room and the paper machine [*id.* at 9]. Murphy stated Plaintiff made complaints and/or grievances about him prior to November 2004 [*id.* at 12]. Murphy could recall one complaint when he asked Plaintiff to wash around the shower tanks and Plaintiff complained [*id.*]. Murphy stated he did not know if Plaintiff actually filed a grievance or just complained to McDougal [*id.*].

Murphy stated he was also aware Plaintiff had filed a grievance about him in November 2004 [*id.* at 13]. Murphy characterized the allegations in Plaintiff's grievance as slanderous [*id.* at 13, 16].

With regard to the incident on February 1, 2005, Murphy stated:

> I asked – [Plaintiff] was coming in to empty his scavenger hopper which is his job, and he was coming to get it, and he pulled the hopper out. I noticed a bunch of debris in the bottom of it, so I directed him to get a tire and sweep it out from there.

[*id.* at 20]. Murphy stated Plaintiff's responded it was not his job, and he told Plaintiff it was his job [*id.* at 20-21]. Murphy stated he "directed" Plaintiff to do the job and Plaintiff said, "No. He said he was going to call Mike McDougal" [*id.* at 21]. Murphy said he told Plaintiff he wanted to see Plaintiff and his Union representative in the office [*id.*].

Murphy stated after he went into the office, he telephoned McDougal, told him the situation, and McDougal told him to send Plaintiff home [*id.* at 23]. Murphy stated he never told McDougal that Plaintiff said he was going to call McDougal [*id.*]. Murphy estimated approximately 20 minutes elapsed between the time he told Plaintiff to remove the debris and the time Murphy completed his telephone conversation with McDougal [*id.* at 28].

Based upon McDougal's instructions, Murphy told Plaintiff he was being sent home and a meeting would be held the next day [*id.*]. Murphy stated the Union representatives present wanted to know why Plaintiff was being sent home and he told them "[r]efusal to do his job that I asked him to do. I directed him to do..." [*id.* at 29].

Murphy stated that within one-half an hour, the debris was cleaned up [*id.* at 30]. He stated the number one filler man "steps up to do the No. 2 man's job. He went over there and got the forklift and the tire and took care of it." [*id.*].

Murphy testified when he met with Plaintiff in the office he was frustrated, but not angry, with the Plaintiff and did not act aggressively toward Plaintiff [*id.* at 32]. Murphy stated he told Plaintiff to bring a Union representative to the office [*id.*]. Murphy testified, "I told [Plaintiff] that if he didn't do

the job he was directed to do, he was going to be sent home for insubordination." [*Id.* at 33].  Murphy also admitted Plaintiff told him he was going to call McDougal and Murphy stated he never tried to stop Plaintiff from calling McDougal [*id.*].  Murphy stated he would not have considered Plaintiff's action to be insubordination if Plaintiff had done the job of cleaning up the debris and then requested to call McDougal [*id.* at 34].  However, Murphy stated he considered Plaintiff's action in stating it was not his job and walking off to call McDougal to be insubordination [*id.*].

Murphy also testified he did not bump into the Plaintiff earlier in the day on February 1, 2005 [*id.* at 41-42].  Murphy further testified he had no recollection of being accused of bumping into Plaintiff in the meeting on February 2, 2005 [*id.*].

Murphy testified Stoker, who is Caucasian, replaced Plaintiff as the number two filler operator [*id.* at 45].  Murphy stated Stoker replaced Plaintiff because he was next in the line of progression based on seniority [*id.*].

### 12.     Walter Lancaster's Deposition Testimony

The May 9, 2007 deposition of Lancaster also appears in the record [Doc. No. 30-3].  Lancaster stated he has been employed as vice-president and general manager since 1999 [*id.* at 8].  Lancaster stated he first met Plaintiff in 1987, when he worked at the Chattanooga facility for about eighteen months [*id.* at 15].  Lancaster was the assistant superintendent at that time [*id.* at 16].  Lancaster stated he occasionally supervised Plaintiff during the aforementioned eighteen month period [*id.*].  Lancaster stated his opinion of Plaintiff's work was that Plaintiff "needed direction." [*id.*].

Lancaster testified Murphy was hired as a supervisor at the Chattanooga mill in 2000 [*id.* at 33].  To the best of his recollection, Lancaster received only one complaint about Murphy, a comment from a member of the Union [*id.* at 34].  Lancaster stated, however, he could not remember any of the specifics about the comment [*id.* at 35].

Lancaster testified about the grievance procedure set forth in the CBA [*id.* at 35]. He was shown a grievance filed by Plaintiff in August 2003, relating to an event which occurred in September 2002 [*id.* at 38]. Plaintiff also filed an EEOC complaint in September 2003 [*id.* at 51]. Lancaster stated he recalled the situation and was one of the persons named in the grievance [*id.* at 39]. Lancaster stated he investigated the grievance; and, he believed Ken Crenshaw, the "divisional human resources gentleman" for Rock-Tenn, spoke with Plaintiff [*id.* at 41]. Lancaster stated the grievance:

> alleged an event that had taken place almost a year earlier and my interaction with [Plaintiff] at that time relative to the way he drove a fork truck. I handled it one-on-one and thought it was a done deal. . ..

[*id.* at 51]. Lancaster stated that Plaintiff's claim the event was proof of retaliation or harassment upset him [*id.*].

Lancaster stated Plaintiff's work ability had not been challenged and Plaintiff had "done his job except for the few times he's been counseled for not doing it." [*Id.* at 51-52]. Lancaster admitted, however, by September 2003 he held the opinion that Plaintiff was not a truthful person [*id.*].

Lancaster was shown the grievance reports filed by Plaintiff in November 2004 [*id.* at 55]. With regard to the two supervisors named in the grievance reports, Murphy and Akins, Lancaster stated "[t]hey didn't like being accused of harassment when they were just supervising the employee" [Doc. No. 30-4 at 3]. Lancaster also admitted Murphy and Akins did not appear to have a good relationship with Plaintiff at that time [*id.*].

With regard to the events of February 1, 2005, Lancaster testified it was his understanding Plaintiff:

> was instructed to clean up some excess rubbish or debris that had fallen beyond the limits of the hopper that was on the floor where the hopper would be going back in place. He was told to clean that up before we put the hopper back in.

[*Id.* at 12-13]. Lancaster further stated the utility man and filler man's jobs have responsibilities that overlap, and "when the supervisor directs you to do a job, to me it's basic to the work relationship that you do that job." [*Id.* at 13]. Lancaster stated Plaintiff's response to the instruction to clean up debris was "he said it's not my job and I'm not going to do it. I've been here longer than you, and I'll be here when you're gone." [*Id.*]. Lancaster stated Murphy told him that was what Plaintiff said [*id.*].

Lancaster stated when the February 1, 2005 incident occurred, he was traveling and McDougal called him and told him that Plaintiff had been sent home because he refused an order from Murphy [*id.* at 14-15]. When asked what he next learned or heard about the incident, Lancaster testified:

> I heard that [Plaintiff] had refused to do the job, was looking to discuss it with Mr. McDougal instead of following Mr. Murphy's orders, delayed doing the job by getting the union out there to make his case and was told that Mr. Murphy ignored all that and just sent him home.

[*Id.* at 15].

Lancaster stated there were two meetings held with the Union representative about the February 1, 2005 incident [*id.* at 16]. Lancaster was not involved in the first meeting, but was involved in the second meeting [*id.* at 16-17]. Lancaster stated Plaintiff told his side of the story at the meeting [*id.* at 17]. He further stated Plaintiff told him he did not refuse to clean up the debris [*id.*]. Lancaster also stated it was his understanding that when the Union representatives were present with Plaintiff and Murphy in the office after the incident and asked Plaintiff whether he refused to do what Murphy had directed him to do, Plaintiff stated he did not refuse to do it [*id.* at 23]. Lancaster stated he also understood Plaintiff felt it was not his job to do [*id.*].

Lancaster further stated he was aware Plaintiff stated when he walked away he was trying to telephone McDougal [*id.* at 28]. Lancaster stated he believed Plaintiff was trying to telephone McDougal, but he also believed Plaintiff told Murphy he was not going to do the job [*id.* at 29]. When

asked why he believed Murphy rather than Plaintiff, Lancaster stated, "Well, Mr. Murphy's a supervisor and the whole structure of the situation just seemed like that's the way it would have played out." [*Id.*].

When asked what the harm was in Plaintiff attempting to contact McDougal if he felt he was being harassed, Lancaster stated "[t]he job would go undone. He would have had to ignore a direct order from his supervisor." [*Id.* at 32]. Lancaster admitted no harm would result if the job went undone for a few minutes while Plaintiff telephoned McDougal, but said:

> The only thing about the job being undone is that the employee was directed to take care of it. He refused to do it. He did not do it. That's the only harm of it. The only harm is we're paying this employee to be on site to do a job and the time that he is arguing or refusing to do that job, he's still getting paid.

[*Id.* at 33].

Lancaster also stated he was present at a meeting where Plaintiff was instructed to contact McDougal if he had a problem with a supervisor [*id.* at 18]. Lancaster admitted he gave that instruction to Plaintiff, and that one reason for the instruction was the ongoing problem between Murphy and Plaintiff [*id.*]. With regard to his instruction to Plaintiff that he should call McDougal if he thought he was being harassed, Lancaster testified, "[a]t no time was [Plaintiff] instructed to avoid doing his job or refuse to do his job or not do his job in lieu of discussing what he perceived to be harassment." [*Id.* at 52]. Lancaster testified that in most situations if an employee is instructed to do something that is not his job, "[t]he employee does the job and then files a grievance if he feels it was unjust." [*Id.* at 53]. Lancaster stated he did not expect that if Plaintiff thought he were being harassed Plaintiff would seek out McDougal and stop the work process [*id.* at 54-55]. Lancaster stated:

> When he felt he was being harassed by me, he waited a year before he brought it to paper. When he felt he was being harassed by Mr. Murphy he brought it to paper. There was no stoppage of the work in those events. When he was told that he should contact Mr.

McDougal – at his request he asked who should I contact. There was no stoppage of work inferred or certainly not implied.

[*Id.* at 57-58].

### 13. The November 2004 Grievances

Copies of the grievance reports filed by Plaintiff on November 1, 2004 appear in the record [Doc. No. 19-3]. The first grievance concerns Murphy [*id.* at 1]. In his grievance, Plaintiff stated that "I have been to the office three times because of Bill Murphy lies. He acts like he wants to fight . . . John Stagmaier and Rock-Tenn mill is behind this because they won't say anything to Bill. He has said he is going to fire my ass . . . I cannot work under this pressure." [*Id.*]. The grievance procedure first "step" answer states:

> These allegations toward Bill Murphy and Company are false. Bill was present when fellow supervisor Fred Akins counceled [sic] [Plaintiff] on job performance. These allegations are retaliatory and are an [sic] slanderous attempt to rebuff supervision. Grievance Denied.

[*Id.*]. The grievance procedure second and third "steps" also reject the Plaintiff's claims [*id.*]. The report reflects a decision was made not to arbitrate this grievance [*id.*].

The second grievance report names Akins and states: "Harassment that is order by company to do. I was told to do a job by feeding the beater . . . I told [Akins] that's the way I was told to do. But he did not want to here [sic] that. He said his way or hit the clock." [*Id.* at 2]. The grievance procedure first "step" states:

> Supervisors handle, control, and direct the workforce. Supervisor Fred Akins Appropriately counceled [sic] and directed [Plaintiff ] on how to do his job.

[*Id.*]. The grievance procedure second and third "steps" also reject the Plaintiff's claims [*id.*]. The report reflects a decision was made not to arbitrate this grievance [*id.*].

## 14.      The Collective Bargaining Agreement

Rock-Tenn also identified section 13 of the CBA, which sets forth company rules, as the basis

for its discharge of Plaintiff [*id.* at 9].  The CBA, section 13, states in pertinent part:

> The Company Rules listed below are designed to fairly and
> impartially regulate employees' actions in order to obtain and
> maintain an orderly and proper operation of the mill.
> Since the violation of some rules are more serious than the violation
> of others, the rules have been divided into two groups, governed by
> the seriousness of the offense.
> . . .
> GROUP II
> FIRST OFFENSE – DISCHARGE
> . . .
> 10.      Insubordination (refusal to perform services connected
> with his [job] and the efficient operation of the plant
> as required by his supervisor, or refusal to obey any
> reasonable order given by his supervisor or
> supervisors).

[Doc. No. 19-4 at 11].

## III.      Rock-Tenn's Motion for Summary Judgment

Rock-Tenn seeks summary judgment on Plaintiff's claims asserting Plaintiff cannot succeed

on his claim of racial discrimination under Title VII because Plaintiff: (1) cannot establish a *prima facie*

case of racial discrimination and (2) assuming Plaintiff could establish a *prima facie* case of racial

discrimination, Rock-Tenn has offered a legitimate, non-discriminatory reason for Plaintiff's

termination, *i.e.,* Plaintiff's insubordination, which Plaintiff cannot show was a pretext for racial

discrimination [Doc. No. 19 at 1-2].  Rock-Tenn also asserts Plaintiff cannot succeed on his claim for

retaliation under Title VII, because Plaintiff cannot establish a causal connection between any protected

activity and any adverse employment action [Doc. No. 19 at 2].  Rock-Tenn further asserts Plaintiff

cannot succeed on his claim for punitive damages because he cannot establish by a preponderance of

the evidence that any adverse employment action by Rock-Tenn was taken with malice or reckless indifference to Plaintiff's federally protected rights [Doc. No. 19 at 1, 3].

## A.     Standard of Review

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  The court cannot weigh the evidence or determine the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute.  *Id.*  A mere scintilla of evidence is not enough.  *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  The court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party.  *Anderson*, 477 U.S. at 248, 249; *National Satellite Sports*, 253 F.3d at 907.

## B.     Plaintiff's Claim of Racial Discrimination Under Title VII

Rock-Tenn asserts Plaintiff cannot succeed on his Title VII claim for racial discrimination because he has no direct evidence of discrimination and he cannot establish a *prima facie* case using circumstantial evidence [Doc. No. 19 at 7-8].  With regard to establishing a *prima facie* case, Rock-Tenn concedes "Plaintiff is a member of a protected class qualified for his position." [*Id.* at 10].  Rock-

Tenn also concedes "[a]lthough Plaintiff was reinstated to his position at Rock-Tenn with back pay, . . . his termination represents an adverse employment action." [*Id.*]. Rock-Tenn asserts, however, that Plaintiff cannot establish his *prima facie* case because he "cannot demonstrate that any similarly situated, non-African American employee was treated more favorably." [*Id.*].

Plaintiff contends he can establish a *prima facie* case of racial discrimination because he was replaced by someone outside of his protected class following his termination [Doc. No. 28 at 8]. Plaintiff further contends the stated reason for his termination, insubordination, had no basis in fact and that the attitudes, actions and statements of Rock-Tenn's management evidence animus against Plaintiff based on his race and protected activity [*id.*].

### 1.    Legal Standard

Title VII makes it:

> an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin.

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). "Generally speaking, a plaintiff in a race discrimination action 'has the burden of proving by a preponderance of the evidence a *prima facie* case.'" *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). Once the existence of a *prima facie* case is established, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)). "If the defendant meets this burden, the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination." *Id.* "Even though the burden of going forward with the evidence may shift between the plaintiff and the defendant, the burden

of persuasion always remains with the plaintiff." *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984) (citing *Haynes v. Miller*, 669 F.2d 1125, 1126-27 (6th Cir. 1982)).

A plaintiff can meet his burden of establishing a *prima facie* case

> by providing direct or circumstantial evidence that raises a genuine issue that his employer discriminated against him or by simply proving that (1) he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position and (4) that a person outside the protected class was treated more favorably than him or that he was replaced by a person outside of the protected class.

*Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001); *Johnson v. University of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir.), *cert. denied*, 531 U.S. 1052 (2000).

Once an employer has come forward with a non-discriminatory reason for terminating a plaintiff, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). In order to show that a jury could reasonably reject an employer's explanation, *i.e.*, to survive summary judgment, a plaintiff must show "by a preponderance of the evidence" the reasons proffered by the employer "(1) had no basis in fact, (2) did not actually motivate the employer's action or (3) that they were insufficient to motivate the employer's action." *Dews v. A. B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000) (citing *Manzer*, 29 F.3d at 1084).

"The plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite*, 258 F.3d at 493-94 (quoting *Wyothal v. Tex-Tenn. Corp.*, 112 F.3d 243, 246-47 (6th Cir. 1997)) (citing *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir. 1998)). To determine whether the employer held an "honest belief" in the proffered basis for its adverse employment action, the Sixth Circuit "looks to whether the

employer can establish its 'reasonable reliance' on the particularized facts that were before it at the time the decision was made." *Id.* at 494 (citing *Smith*, 155 F.3d at 807). In deciding whether reasonable reliance was present the Sixth Circuit has stated it does:

> not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

*Smith*, 155 F.3d at 807.

As long as an employer honestly believes in the proffered reason for an adverse employment action, "the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Id.* at 806. If an employer "honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer . . . lacks the necessary discriminatory intent." *Id.* "[A]rguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for [an adverse employment] decision are '*right* but whether the employer's description of its reasons is *honest*.'" *Id.* (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677 (7th Cir. 1977)).

### 2.     Analysis

Direct evidence is evidence that, if it is believed, would require a conclusion unlawful discrimination was at least a motivating factor in the employer's adverse employment action without drawing any inferences. *Thomas v. Union Institute*, 98 F. App'x 462, 464 (6th Cir. 2004). In this instance, Plaintiff has no direct evidence his termination was the result of racial discrimination. Thus, if Plaintiff is to establish a *prima facie* case of racial discrimination he must do so by circumstantial evidence.

Rock-Tenn has conceded proof of the existence of the first three elements of a *prima facie* case, but contests the fourth element [Doc. No. 19 at 10]. With respect to the fourth element, Murphy testified that Stoker, a white employee, replaced Plaintiff following his termination because Stoker was next in the line of progression based on seniority under the CBA [Doc. No. 30-5 at 45]. Rock-Tenn asserts, relying on *Braithwaite*, 258 F.3d at 493, that this is not sufficient to establish the fourth element of the *prima facie* case as Stoker took over the position based on seniority under the CBA. Thus, Rock-Tenn argues Plaintiff cannot satisfy the fourth element because he cannot establish someone outside the protected class was treated more favorably.

Rock-Tenn is correct that Plaintiff has adduced no evidence he was treated less favorably than someone outside the protected class as it relates to the incident at issue. Likewise, it is undisputed Stoker's replacement of Plaintiff was based on the seniority provisions of the CBA. While the application of a *bona fide* seniority system is not unlawful under Title VII, *Harris v. Anaconda Aluminum Co.*, 479 F. Supp. 11, 25 ( N.D. Ga. 1979) (quoting *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 352 (1977), as Plaintiff can show he was replaced by someone outside of the protected class, he can *arguably* establish the fourth element of his *prima facie* case. *Johnson*, 215 F.3d at 572-73.[4]

Assuming the burden shifts to Rock-Tenn to articulate a legitimate, non-discriminatory reason for Plaintiff's termination, Rock-Tenn has met this burden. Rock-Tenn has asserted its termination of Plaintiff was for insubordination as defined in the CBA based upon Plaintiff's refusal to obey a direct order of his supervisor, Murphy, on February 1, 2005.

---

[4] Although Rock-Tenn asserts Plaintiff cannot establish the fourth prong of his *prima facie* case, it has cited no precedent for the argument that replacement of a terminated employee by a person outside of the protected class based upon a seniority system would preclude establishment of a *prima facie* case nor has the Court's own research disclosed any precedent for such a conclusion.

It is undisputed that on February 1, 2005, Plaintiff's supervisor told Plaintiff to clean up certain debris and Plaintiff did not perform the task. During the February 2, 2005 meeting, Plaintiff stated Murphy ordered or directed him to take the tire and clean up in front of the number two filler beater [Doc. No. 19-8 at 4]. Plaintiff also told McDougal he did not do the cleaning because he wanted to call McDougal [*id.* at 5]. Plaintiff also admitted he essentially told Murphy cleaning up the debris in front of the number two filler beater was not his job to do [*id.* at 5-6]. Plaintiff also confirmed during the arbitration proceeding that when Murphy told him to clean up the debris, he told Murphy it was Wooten's job and he did not have the proper forks on the fork lift he was using to clean the debris [Doc. No. 23-6 at 8]. When Murphy's reaction was that it was Plaintiff's job to do if Murphy told him to do it, Plaintiff stated he was going to telephone McDougal, and walked off to make the telephone call [*id.* at 8]. Likewise, during his deposition, Plaintiff admitted telling Murphy it was not his job to clean up the debris, it was Wooten's job [Doc. No. 19-14 at 23]. Plaintiff admitted he did not do the job of cleaning up the debris when Murphy asked him to do it [*id.* at 27].

Thus, Rock-Tenn has satisfied its burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination, insubordination under the CBA for failing to comply with an order from his supervisor to clean up debris on February 1, 2005. As Rock-Tenn has articulated a legitimate, non-discriminatory reason for Plaintiff's termination, to survive summary judgment Plaintiff must show the legitimate, non-discriminatory reason articulated by Rock-Tenn is a pretext for discrimination.

Plaintiff has not shown pretext because he has not shown by a preponderance of the evidence either 1) that the proffered reason for his termination had no basis in fact, 2) that the proffered reason did not actually motivate his discharge, or 3) that the proffered reason was insufficient to motivate his discharge. *See Manzer*, 29 F.3d 1078, 1084. Although not entirely clear, it appears that Plaintiff is arguing pretext based upon all of the methods of showing pretext.

As to either the first or third methods (the objective showings), the CBA provides that insubordination is a basis for discharge as a first offense and without a warning [Doc. No. 19-14 at 10-11].  The record shows Rock-Tenn made a reasonably informed and considered decision prior to its termination of Plaintiff.  *Smith*, 155 F.3d at 807.  Specifically, the record shows Rock-Tenn considered the facts before deciding to take an adverse employment action against Plaintiff.  Plaintiff was not discharged immediately following the February 1, 2005 incident.  He was sent home in order to defuse the situation and a meeting was held on February 2, 2005, at which time Plaintiff was given an opportunity to tell his version of the events.

At the February 2, 2005, meeting Plaintiff claimed he did not refuse to comply with Murphy's order, he merely wanted to clarify whether Murphy could order him to clean up the debris with McDougal [Doc. No. 19-8 at 5].  Plaintiff also claimed he did not tell Murphy he would not do the job, only that the job was someone else's job [*id.* at 5-6].  Plaintiff essentially claims his actions after Murphy told him to clean up the debris were an attempt to clarify whether Murphy could order to him to clean up the debris based upon his belief the clean up was not his job and Lancaster's instruction to inform a supervisor if he had a problem with a foreman [Doc. No. 23-6 at 8].  Nevertheless, Plaintiff admitted that although he was instructed to call either McDougal or Martin if he had a problem, he was not told he could refuse to follow the instructions of his supervisor until he was able to talk with a superintendent [*id.* at 9].

Lancaster, who made the decision to terminate Plaintiff, was aware that Plaintiff claimed he did not refuse to clean up the debris [Doc. No. 30-4 at 17].  Further, it was Lancaster who instructed Plaintiff to contact McDougal if he had a problem with a supervisor [*id.* at 18].  Lancaster was also aware Plaintiff felt the job Murphy had instructed Plaintiff to do was not his to do and that Plaintiff

claimed when he walked away he was trying to contact McDougal rather than refusing to do the job [*id.* at 23, 28].[5]

Nevertheless, Lancaster stated he believed Murphy because Murphy was a supervisor and because Murphy's version of the events "just seemed like the way it would have played out" [*id.* at 29]. Lancaster also stated although no harm would have resulted during the few minutes Plaintiff spent trying to contact McDougal, his concern was that while Plaintiff attempted to contact McDougal the job remained undone and Plaintiff ignored a direct order from his supervisor [*id.* at 32]. Lancaster further testified that in most situations at the Rock-Tenn facility, if an employee is instructed to do something that is not his job, he does it and then files a grievance [*id.* at 53].

Plaintiff asserts the decision of the arbitrator shows that the legitimate, non-discriminatory reason offered by Rock-Tenn for his termination was a pretext because there was no insubordination. In a Title VII action, the Court considers an employee's claim *de novo*, but an arbitral decision may be admitted and accorded such weight as the Court deems appropriate. *Abrams v. Johnson*, 534 F.2d 1226, 1228 (6th Cir. 1996). Among the factors relevant to the issue of the weight to be accorded to an arbitrator's decision are: (1) the existence of provisions in the CBA which conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, the adequacy of the record with respect to the issue of discrimination, and the special competence of the particular arbitrator. *Id.* at 1228, n. 21. Where the decision gives full consideration to the employee's Title VII rights, the Court may accord great weight to the decision. *Id.*

_____

[5] Although Plaintiff has maintained he did not refuse to clean up the debris when Murphy ordered him to do so on February 1, 2005, during his deposition Plaintiff testified he told Murphy, "it wasn't my job, that was Denny Wooten's job. I said, *even if I wanted to do it*, I don't have the forklift to clamp the tire to clean it." [Doc. No. 19-14 at 23](emphasis added). Based upon the statement Plaintiff admits he made to Murphy, Murphy could have reasonably interpreted Plaintiff's response as a refusal to perform the job.

In this instance, no evidence as to the competence of the arbitrator appears in the record and a review of the arbitral decision reveals the arbitrator did not give full consideration to Plaintiff's termination pursuant to Title VII. Thus, the Court has not accorded great weight to the arbitrator's decision as urged to by Plaintiff. The Court notes, however, that in ordering Plaintiff reinstated with full back pay and benefits it appears the arbitrator found that, given all the circumstances, Plaintiff's actions could have been "mistakenly interpreted" as insubordination---he did not find the claim of insubordination was a pretext [Doc. No. 23-7 at 7]. The arbitrator also stated the best path for Plaintiff to have followed would have been to comply with Murphy's orders and file a grievance later [*id.* at 6]. The arbitrator's finding that Rock-Tenn may have "mistakenly interpreted" Plaintiff's "non-compliance" as insubordination, and thus had no "just cause" for termination under the CBA, does not constitute evidence of pretext.

Plaintiff attacks the credibility of Rock-Tenn's explanation under the second (subjective) method of showing pretext based, in part, upon the history of his relationship with Rock-Tenn. As stated in *Manzer*, the second way to show pretext is of "an entirely different ilk." *Manzer*, 29 F.3d at 1084. The question on summary judgment is whether Plaintiff presented evidence sufficient to permit a jury to find Rock-Tenn's true motive for firing him was more likely to discriminate or retaliate against him than because of his alleged insubordination.

With respect to the second method, Plaintiff first cites the statements in Bonine's affidavit concerning the racially derogatory statements made by Murphy sometime in 1999 through either 2001 or 2002 [Doc. No. 23-3]. While the Court finds the statements attributed to Murphy in Bonine's affidavit troubling if true and in no way condones such statements, the statements do not show racial animus by the decisionmaker at the relevant time. Bonine was employed at Rock-Tenn from 1999 through either 2001 or 2002 [Doc. No. 23-3 at ¶ 2]. Thus, the statements attributed to Murphy in

Bonine's affidavit are far removed, at least three years and possibly more, from the period immediately surrounding the events in February 2005 and do not show racial animus in the period at issue in this case. *See Hopkins v. Electronic Data Sys. Corp.*, 196 F.3d 655, 662-63 (6th Cir. 1999) (holding an isolated remark made by the plaintiff's supervisor lacked sufficient nexus to the plaintiff's termination several months later).

Similarly, although both Rogers' affidavit and Earvin's affidavit state Murphy seemed happy that Plaintiff was terminated [Doc. No. 23-4 at ¶ 13; Doc. No. 23-5 at ¶ 7], the affidavits attempt to address Murphy's state of mind. Further, the termination did not occur until six days after the events of February 1, 2005 and Murphy could simply have been happy his superiors chose to back him up in the dispute rather than having any animus towards Plaintiff. Even assuming Murphy had animus toward black employees and Plaintiff in particular, he was not the decisionmaker. Lancaster, who was the decisionmaker, was aware of the history between Murphy and Plaintiff and no evidence has been presented of any racial bias or comments of Lancaster.

Plaintiff has not shown a question of fact for a jury regarding whether Rock-Tenn's decision to terminate him on February 7, 2005 was a pretext for discrimination. The undisputed evidence shows Rock-Tenn investigated the incident of February 1, 2005, and was aware of Plaintiff's claim he was not refusing to do the job but wanted to clarify whether Murphy could order him to clean up the debris. Plaintiff has not established a genuine issue of material fact as to whether Rock-Tenn's explanation for its decision to terminate him was honest, only whether Rock-Tenn was right in its conclusion he was insubordinate. *See Smith*, 155 F.3d at 807.

Accordingly, that aspect of Rock-Tenn's motion which seeks a summary judgment on Plaintiff's claim of racial discrimination under Title VII [Doc. No. 17] will be **GRANTED**.

## C.    Plaintiff's Claim of Retaliation Under Title VII

Rock-Tenn asserts Plaintiff cannot succeed on a claim of retaliation under Title VII because he cannot establish any connection between his termination and any activity which is protected under Title VII [Doc. No. 19 at 19].  Rock-Tenn asserts:

> Plaintiff's most recent EEOC Charge was over one year and four months prior to his termination.  Rock-Tenn concedes that this is protected activity under Title II and that Rock-Tenn was aware of the activity.  Defendants further concede that Plaintiff's termination, even though he was later reinstated with back pay, could constitute an adverse employment action.  However, the temporal proximity of Plaintiff's EEOC Charge to his termination is . . . insufficient to establish a causal connection.  Plaintiff offers nothing other than his unsubstantiated allegation that he was fired in retaliation for his EEOC Charge.

[*Id.* at 20].

The record is devoid of evidence showing any employee at Rock-Tenn was not discharged for failure to obey an order of his supervisor.  Plaintiff asserts, however, he can satisfy the fourth prong of the *prima facie* case because he was discharged shortly after he filed a grievance concerning Murphy and Akins on November 1, 2004, slightly more than three months before he was terminated.

### 1.    Legal Standard

In order to establish a *prima facie* case of retaliation, a plaintiff must establish: (1) he engaged in activity protected by Title VII; (2) the defendant knew or was aware of his exercise of his civil rights; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Balmer v. HCA, Inc.*, 423 F.3d 606, 613-14 (6th Cir. 2005); *Nguyen*, 229 F.3d at 563.  To show a causal connection, *i.e.*, to establish the fourth prong of a *prima facie* case of retaliation, a plaintiff must adduce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had

the plaintiff not engaged in protected activity. *Nguyen*, 229 F.3d at 563 (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984).

There is no one dispositive factor required to establish a causal connection; however, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Id.* (quoting *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987)). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met. *Id.* (quoting *Avery*, 104 F.3d at 861). A causal link may be shown through knowledge of protected activity combined with closeness in time or temporal proximity. *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). Where the time period between the protected activity and the adverse employment action is less than two months, this is sufficient. *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006). However, "the mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." *Balmer*, 423 F.3d at 615 (internal quotation omitted).

If the plaintiff establishes a *prima facie* case of retaliation, the defendant may rebut the presumption of retaliation from the *prima facie* case by asserting a legitimate, non-discriminatory reason for its actions. *Balmer*, 423 F.3d at 614. The plaintiff must then show by a preponderance of the evidence that the employer's proffered reason for its adverse employment action was pretextual. *Id.* The standard for showing pretext is the same as addressed above and will not be repeated herein.

### 2. Analysis

During his testimony about the November 2004 grievance reports, Plaintiff stated he filed the grievance reports because superintendent Martin told him to feed the beater one way and Murphy and

Akins told him to feed the beater another way [Doc. No. 19-13 at 60]. Plaintiff stated he used the word harassment in the grievance against Akins, but admitted there was no evidence the dispute or difference of opinion between the two foremen and the superintendent as to how to load the beater was in any way related to himself, let alone his race or color [Doc. No. 19-4 at 4]. Thus, based upon Plaintiff's own testimony, his November 1, 2004 grievance reports related to a run-of-the-mill dispute between various supervisory personnel at the Rock-Tenn Chattanooga facility and not any activity protected under Title VII. In his affidavit, however, Plaintiff asserts that during the meeting held in December 2004 concerning his November 2004 grievance reports, he complained Murphy used racial considerations in his work decisions and treatment of Plaintiff, including lying about Plaintiff and threatening Plaintiff with bodily harm [Doc. No. 23-2 at 2].

During his deposition on March 3, 2007, prior to his affidavit, Plaintiff stated he complained to Rock-Tenn's management about harassment [Doc. No. 19-13 at 60]. When asked to describe the harassment, Plaintiff stated the superintendent, Martin, told him to feed the beater a certain way, and Murphy and Akins told him to feed it another way [*id.*]. Plaintiff stated he filed grievance reports alleging harassment against Murphy and Akins because he was caught in a power struggle between the superintendent and Murphy and Akins based upon differing instructions as to how to feed the beater [Doc. No. 19-14 at 1]. When asked how his grievance was resolved Plaintiff stated Lancaster told him to perform the job the way the foreman on his shift told him to perform it [*id.* at 2]. When asked what happened to his grievance, Plaintiff stated "I guess it ended right there" [*id.*]. When asked what evidence he had that this grievance about how to perform his job had to do with either his race or his color, Plaintiff stated he had none [*id.* at 4].

Plaintiff's response to Rock-Tenn's interrogatories appear in the record [Doc. No. 19-5]. Rock-Tenn's interrogatory number four asked Plaintiff to state the facts or grounds upon which he relies to

demonstrate or indicate he was discriminated against after filing a complaint with the EEOC. In pertinent part Plaintiff's discovery answer stated "[i]n approximately December of 2004, Plaintiff filed a grievance against Fred Akins and Mike Murphy. On that occasion, Plaintiff complained that he was subjected to harassment and discrimination by Akins and Murphy." [*Id.* at 7].

Lancaster testified about the December 3, 2004 meeting [Doc. No. 30-4 at 1-3]. Lancaster admitted he did not have a very thorough recollection of the December 3, 2004 meeting, but it was his recollection that Plaintiff's concerns "dealt with him being directed to do some part of his job by Mr. Murphy and somehow resisting one to do that and that Mr. Murphy pointing out that he didn't do something or didn't do it the way he was told." [*Id.* at 2].

Rock-Tenn contends the statements in Plaintiff's affidavit concerning his allegations of harassment in the November 2004 grievance reports contradict his statements in his deposition and response to Rock-Tenn's interrogatories. In his deposition testimony, Plaintiff described his grievance against Murphy as involving the contradiction between the instructions from Murphy and Akins and superintendent Martin as to how to load the beater. Nowhere in his deposition or in response to interrogatories did Plaintiff identify an additional claim of harassment or retaliation he made to Lancaster during the December 3, 2004 meeting on his November 1, 2004 grievance reports. Thus, Plaintiff's affidavit is not entirely consistent with the statements Plaintiff made during his deposition that the November 2004 grievance reports had nothing to do with race or color [Doc. No. 19-14 at 2-4].

Generally speaking, a party may not create a factual issue by filing an affidavit after a motion for summary judgment which contradicts his earlier deposition testimony. *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). However, in *Briggs v. Potter*, 463 F.3d 507, 512-17 (6th Cir. 2006), the Sixth Circuit narrowed the definition of "contradictory" and stated when an affidavit brings forth information not previously elicited by direct questioning the affidavit should be considered.

During his deposition, Plaintiff was extensively questioned about his November 1, 2004 grievance reports, but he was not directly questioned about the December 3, 2004 meeting. Thus, the Court will give Plaintiff the benefit of the doubt and consider the statements in Plaintiff's affidavit concerning the alleged claims he made during the December 3, 2004 meeting.[6] Therefore, based upon his affidavit, the additional charges Plaintiff alleges he made during the December 3, 2004 meeting concerning Murphy would constitute protected activity under Title VII. *Crawford v. Metropolitan Government of Nashville and Davidson County*, 211 F. App'x 373, 375 (6th Cir. 2006) (per curiam).

When considering the temporal proximity between the December 3, 2004 meeting and Plaintiff's termination was only approximately two months, Plaintiff has established a genuine issue of material fact as to whether he can establish a *prima facie* case of retaliation. However, for the reasons set forth above in connection to Plaintiff's claim of race discrimination, Rock-Tenn has articulated a legitimate, non-discriminatory reason for Plaintiff's termination which Plaintiff cannot show by a preponderance of the evidence is a pretext. Accordingly, there is no genuine issue of material fact and that aspect of Rock-Tenn's motion which seeks summary judgment on Plaintiff's claim of retaliation under Title VII [Doc. No. 17] will be **GRANTED**.

### D.    Punitive Damages

Rock-Tenn asserts, relying on the decision in *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526-35 (1991), the even if Plaintiff succeeds on his claims for racial discrimination or retaliation under Title VII, it is not liable for punitive damages under 42 U.S.C. § 1981 because Plaintiff has failed to offer evidence

---

[6] In his affidavit, Plaintiff stated that during the December 3, 2004 meeting, he communicated that Murphy was harassing him because of his race and prior EEOC complaints against Rock-Tenn [Doc. No. 23-2 at 2, ¶ 12]. It is not clear from this statement whether Plaintiff was referring to events which occurred between November 1, 2004 and December 3, 2004, or was merely reiterating prior complaints about Murphy.

concerning Rock-Tenn's state of mind and nothing beyond unsupported allegations that Rock-Tenn acted intentionally or with reckless disregard or indifference to Plaintiff's protected rights [Doc. No. 19-24]. Based upon the Court's finding that Rock-Tenn is entitled to a summary judgment on Plaintiff's claims of race discrimination and retaliation under Title VII, Rock-Tenn's argument is moot.

### E. Subject Matter Jurisdiction

Rock-Tenn has raised the issue of whether this Court has subject matter jurisdiction; namely, whether Plaintiff has satisfied the jurisdictional prerequisites for this suit. Rock-Tenn asserts Plaintiff has failed to prove: 1) he received a notice of a right to sue from the EEOC, 2) when he received the notice, and 3) whether he timely filed his complaint after receipt of a notice of a right to sue [Doc. No. 30 at 1].

A plaintiff alleging discrimination under Title VII must satisfy the two administrative prerequisites for such suit: (1) the filing of timely charges of employment discrimination with the EEOC and (2) receiving and acting upon the EEOC's statutory notice of a right to sue. *Nichols v. Muskingum College*, 318 F.3d 674, 677 (2003). Attached to Rock-Tenn's reply is an EEOC charge concerning his termination which Plaintiff filed on April 11, 2005 [Doc. No. 30-2]. Under 42 U.S.C. § 2000e-5(e)(1), a charge with the EEOC is timely if it is filed within 180 days of the alleged unlawful practice. *Nichols*, 318 F.3d at 677-78. As Plaintiff filed his EEOC charge on April 11, 2005 and the alleged unlawful practice occurred on February 7, 2005, the first of the two administrative prerequisites for this action have been satisfied.

The proper exhaustion of administrative remedies allows the employee to bring an employment-discrimination claim in court. *Granderson v. University of Michigan*, 211 F. App'x 398, 400 (6th Cir. Dec. 12, 2006). A Title VII plaintiff must file his lawsuit within 90 days after receiving the right to sue letter. *Page v. Metropolitan Sewer District of Louisville*, 84 F. App'x 583, 584-85 (6th Cir. 2003).

Because no evidence appeared in the record as to whether Plaintiff received a right to sue notice and, if so, when, the Court ordered Plaintiff to file a response to Rock-Tenn's challenge to the subject matter jurisdiction. Attached to Plaintiff's response [Doc. No. 35] is the right to sue notice mailed by the EEOC on January 5, 2006 [Doc. No. 35-2].

Plaintiff filed his complaint on April 6, 2006 [Doc. Nos. 1-2, 35 at 1]. In the Sixth Circuit there is a presumption "that mail is received by the addressee and the ninety day time limit begins to run five days after the EEOC Notice of Right to Sue is mailed." *Cook v. Providence Hosp.*, 820 F.2d 176, 179 n. 3 (6th Cir. 1987). Thus, the ninety-day period for Plaintiff to have commenced his suit would have begun on January 10, 2006. Because Plaintiff filed his action on April 6, 2006, within that ninety-day period, Rock-Tenn's challenge to the Court's subject matter jurisdiction over this action pursuant to Rule 12(b)(1) is **MERITLESS**.

## IV. Plaintiff's Motion to Strike

Plaintiff moves to strike exhibits E, G, H and I to Rock-Tenn's motion for summary judgment or, in the alternative, to exclude the exhibits from consideration in connection with Defendant's motion for summary judgment on the ground they are not authenticated by affidavit or declarations of persons with personal knowledge of their content [Doc. No. 29]. Exhibits E are the interview notes of Rock-Tenn's Human Resources Director John Stagmaier, Exhibit F is a written account of the incident of February 1, 2005, Exhibit H and I are from Plaintiff's personnel file at Rock-Tenn.

Documents submitted in support or opposition to a motion for summary judgment must be attached to an affidavit which "both identifies and authenticates each document." *AT & T Corp. v. Overdrive, Inc.*, No. 1:05CV1904, 2006 WL 3392746, * 2 (N.D. Ohio Nov. 21, 2006) (citing *Stuart v. General Motors Corp.*, 217 F.3d 621, 635 n. 20 (8th Cir. 2000); *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000); *Klein v. Manor Healthcare Corp.*, 19 F.3d 1433, 1994 WL 91786, * 6 (6th Cir. Mar. 22,

1994)). Plaintiff is correct that Exhibits E, F, H and I [Doc. No. 19-6, 19-7, 19-9 and 19-10] originally were not accompanied by an affidavit, or any other document, identifying and authenticating the documents. However, Rock-Tenn filed a response to Plaintiff's motion to strike [Doc. No. 33], which included an affidavit of John Stagmaier, the Human Resources Manager for Rock-Tenn's Chattanooga facility [Doc. No. 33-2]. In his position, Stagmaier maintains the employment records at Rock-Tenn's Chattanooga facility, and his affidavit both identifies and authenticates Exhibits E, F, H and I [*id.*].

Accordingly, Plaintiff's motion to strike Exhibits E, F, H and I to Rock-Tenn's memorandum in support of its motion for summary judgment [Doc. No. 29] will be **DENIED**.

**V.      Conclusion**

For the reasons stated in detail above:

(1)      Rock-Tenn's motion for summary judgment [Doc. No. 17] is

         **GRANTED**;

(2)      Plaintiff's motion to strike [Doc. No. 29] is **DENIED**;

(3)      Plaintiff's motion to consider the affidavit of Calloway [Doc. No. 39]

         is **DENIED**; and

(4)      This action will be **DISMISSED WITH PREJUDICE**.

A separate judgment will enter.

         **SO ORDERED.**

         **ENTER:**


                                    s/*Susan K. Lee*
                                    SUSAN K. LEE
                                    UNITED STATES MAGISTRATE JUDGE